**Norman B. SMITH, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 85–175.**

Supreme Court of Wyoming.

July 8, 1986.

Amended Petition for Rehearing Denied Aug. 19, 1986.

Donald L. Painter, Casper, for appellant.

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., John W. Renneisen, Sr. Asst. Atty. Gen. and J.C. DeMers, Asst. Atty. Gen., for appellee.

Before THOMAS, C.J., and BROWN, CARDINE, URBIGKIT and MACY, JJ.

MACY, Justice.

Appellant Norman B. Smith was convicted by a jury on six counts of issuing false financial statements under § 6–3–105, W.S. 1977, one count of conveying previously mortgaged property under § 6–7–603, W.S. 1977, and one count of perjury under § 6–8–101, W.S.1977.[1]

---

**1.** Each of the statutes under which appellant was convicted has since been renumbered and amended. Section 6–3–105 now appears as § 6–3–613, W.S.1977 (June 1983 Replacement),

We affirm.

Appellant raises the following issues: "1. Whether, as a matter of law, Defendant's convictions under § 6–3–105 W.S.1977, prohibiting false financial statements is supported by any credible evidence of falsity where the State only showed no *recorded* property interest without showing no interest or asset of any kind.

"2. Whether there can be a conviction under § 6–3–105 W.S.1977, where there has been no reliance by the victim upon the claimed falsity of the subject financial statements.

"3. Whether there can be a conviction under § 6–7–603 W.S.1977, where there was no proof of intent at the time of the claimed second transfer.

"4. Whether there can be a conviction under § 6–7–603 W.S.1977, where the subject property was never within the State of Wyoming.

"5. Whether, under the evidence in this case, the 'victim' in this case received any kind of secured interest or ownership interest in the subject property.

"6. Whether, as a matter of law, there is any credible evidence to support Defendant's conviction under § 6–8–101 W.S.1977." (Emphasis in original.)

We will address issues one and two in part I of the opinion, issues three through five in part II, and issue six in part III.

I

In 1977 or 1978, in order to undertake various projects as a real estate investor, appellant formed Rocky Mountain Properties, Inc. (RMPI), a corporation in which he was the sole shareholder. Through RMPI, he then formed 23 limited partnerships in which he, his brother, or RMPI served as the general partner. The limited partners were the investors through which money was raised for the planned real estate projects. Of the 23 limited partnerships, we are concerned with only RMB Model Home Associates, Ltd. (Model Homes) and Mini-Warehouse # 2 Associates, Ltd. (Mini-Warehouse # 2). On behalf of these two limited partnerships, appellant, as general partner, issued six financial statements which were the bases for his conviction under § 6–3–105.[2] Three of the financial statements indicated that Model Homes had assets which included $87,000 in land. This figure represented the amount Model Homes agreed to pay under a purchase and lease agreement as the down payment for five lots. The remaining three financial statements indicated that Mini-Warehouse # 2 had assets which included $22,500 in land and $37,500 in capital improvements. These figures represented the amounts Mini-Warehouse # 2 agreed to pay for the contract right to purchase certain land and preconstruction expenses. The jury found that each of the statements contained false information concerning the financial situation of the limited partnerships.

▉ Appellant contends that there was insufficient evidence to support his conviction under § 6–3–105 in that the State showed only that there was no *recorded* property interest in the subject lands and failed to show that no property interest existed. He asserts that a record search establishing that neither limited partnership ever had title to the land in question is insufficient to establish that the financial statements were false within the meaning

§ 6–7–603 as § 6–3–607, W.S.1977, 1985 Cum. Supp., and § 6–8–101 as § 6–5–301, W.S.1977 (June 1983 Replacement).

2. The former § 6–3–105 provided in part: "Any person who knowingly makes or publishes in any way whatever * * * any book, prospectus, notice, report, statement, exhibit or other publication of or concerning the affairs, financial condition or property of any corporation, joint stock association, copartnership or individual, which * * * shall contain any statement which is false or willfully exaggerated, or which is intended to give, or which shall have tendency to give, a less or greater apparent value to the shares, bonds, or property of said corporation, joint stock association, copartnership or individual, or any part of said shares, bonds or property, than said shares, bonds or property, or any part thereof, shall really and in fact possess, shall be deemed guilty of a felony * * *."

of § 6–3–105. It is appellant's position that because Model Homes and Mini-Warehouse # 2 had contract interests in the property, it was proper to list the property as an asset, whether or not the contract ultimately ended in default.

When the sufficiency of the evidence supporting a conviction is questioned, we review the evidence in the light most favorable to the prosecution. *Smith v. State*, Wyo., 564 P.2d 1194 (1977). If the evidence, along with inferences which may be fairly drawn from it, is sufficient to form the basis for finding guilt beyond a reasonable doubt, we will not interfere with the jury's verdict. *Simmons v. State*, Wyo., 687 P.2d 255 (1984). Applying these standards to the present case, we find the evidence sufficient to support the jury's verdict.

At trial, a certified public accountant testified that the $87,000 entry could reflect money paid for land. He testified further that although the $37,500 entry would normally be labeled as prepaid building costs and not as capital improvements, the entry could still properly reflect an asset. However, his testimony was based on the assumption that the $87,000 and $37,500 were actually paid. That is, in order to qualify as assets, the $87,000 and $37,500 entries must represent cash paid out, not merely a commitment for payment in the future.

According to appellant, the $87,000 entry referred to money paid Rocky Mountain Builders, Inc. pursuant to the purchase and lease agreement under which Rocky Mountain Builders, Inc. was to supply five lots upon which it would build houses. Initially, lots 1 through 5 of a subdivision were involved; later the lots were changed to 16 through 20.

With respect to Model Homes' $87,000 down payment for the five lots, the State elicited the following testimony from the general manager of Rocky Mountain Builders, Inc.:

"A. The five lots, 1 through 5, we never did own them. They were sold—we had a purchase agreement to buy the lots and

they were sold to Pulte Homes before we exercised our purchase agreement * * *.

"Q. So * * * this purchase and lease agreement just didn't come about?

"A. That is correct.

 \* \* \* \* \* \*

"Q. To your knowledge, did Model Homes ever own that property?

"A. They couldn't have. They could not have, not the five lots.

 \* \* \* \* \* \*

"Q. Did Model Homes Associates ever pay $87,000 to Builders for this property [lots 1 through 5 or 16 through 20]?

"A. No."

With respect to the $37,500 for capital improvements listed as an asset of Mini-Warehouse # 2, the following testimony was given by one of appellant's investors:

"Q. * * * [D]id you discuss development on that Mini Warehouse # 2 property with Mr. Smith personally?

"A. Yes, I did, * * * then in November, * * * I went out to look at the Mini Warehouse location; supposedly the construction was underway.

 \* \* \* \* \* \*

"Q. Did you talk to Mr. Smith then about what was happening on that property?

"A. Yes, I did. After we went out there and saw that nothing had been done, the land was still just as it had been * * *.

"Q. What had he told you about the condition of the land prior to going out there?

"A. He had stated that the foundation was being prepared for the building.

 \* \* \* \* \* \*

"Q. Did you observe any evidence, any signs that a foundation was being prepared?

"A. There was no dirt work at all.

 \* \* \* \* \* \*

"Q. * * * What was the condition of the land at that time when you went out there * * *?

"A. The Mini Warehouse 2 land * * * was still grass. It was fenced in but it was grass."

Appellant contends, however, that the $37,500 entry was for preconstruction work. Yet, the general manager of the corporation which was to raise the construction money and build the warehouses testified that he knew of no capital improvements on the land.

From the testimony quoted above and the reasonable inferences that may be drawn from it, we hold that the jury could have concluded that the claimed payments for the purchase of the land and preconstruction expenses were never made. The payments having not been made, the entries on the financial statements gave greater apparent value to property held by the limited partnerships than actually existed and thus violated § 6–3–105.

■ Appellant next contends that even if the financial statements were false, his conviction under § 6–3–105 cannot be upheld absent a showing by the State that the investors relied upon the statements. He argues that because the statements were issued after the investments were made, none of the investors relied upon the statements. Appellant notes that before one may secure redress for fraud, he "must have relied upon the statement or representation as an inducement to his action or injurious change of position." 37 Am. Jur.2d, Fraud and Deceit § 223 at 297 (1968). According to appellant, if the less punitive civil liability requires reliance, then certainly reliance must be an element for purposes of criminal liability.

The quick answer to appellant's claim is that the statute makes no mention of reliance as an element of the crime. Although penal statutes are to be narrowly construed, they need not be given overnarrow meanings in disregard to the obvious purpose of the legislature. *State v. Stern,* Wyo., 526 P.2d 344 (1974). We must recognize what is not in the statute as well as what is. *Voss v. Ralston,* Wyo., 550 P.2d 481 (1976).

We addressed substantially the same question in the case of Cronin v. State, Wyo., 678 P.2d 370 (1984). In that case, after noting that the purpose of a civil fraud action is to compensate an injured party for relying on the misrepresentation, we stated:

" * * * [W]here fraud is an element of a statutory crime, the result of the fraudulent misrepresentation is the same whether the person upon whom the defendant works his or her wiles relies upon the misrepresentations or not.* * * " 678 P.2d at 371.

This holding is equally applicable in this case, it being the intent of the legislature to protect the public at large from any harm that may result from a person knowingly making or publishing a false or misleading document.

We, therefore, hold that there is no necessity to prove that a specific victim relied upon appellant's financial statements before he can be convicted of the subject crime.

## II

■ We turn now to appellant's conviction for conveying previously mortgaged property under § 6–7–603. In 1979, upon obtaining several investors for a new real estate project, appellant signed promissory notes which provided that the investors could recover their investments under stated conditions. When commencement of the project was delayed, several of the investors sought to recover their investments in accordance with the terms of the notes. Because appellant no longer had the money, he offered an investment grade diamond as collateral on the investments. On the basis of the testimony presented at trial, the jury found that he later mortgaged the same diamond to a third party without the permission of the original investors in violation of § 6–7–603. That statute provided in relevant part:

"Any person who, after having conveyed any goods, chattels, personal property, rights or privileges to another, by mortgage, bond, conveyance *or instrument*

*intended to operate as a mortgage, including security agreements* and financing statements, whether of record or otherwise, shall, during the existence of the lien created thereby, sell or attempt to sell, or dispose of the said property, rights, or privileges, or any part thereof, to any person or persons, or corporation, without first procuring the written consent of the mortgagee or secured party thereof to such sale * * * shall be deemed guilty of a felony * * *." (Emphasis added.)

Appellant raises three issues with respect to his conviction under § 6–7–603. First, he claims that he explained to his investors that he could not provide the diamond as security and thus believed he was free to mortgage the diamond to a third party. Therefore, he argues that at the time of the mortgage he had no intent to defraud as required by § 6–7–603.

In *Kempton v. State,* Wyo., 488 P.2d 311 (1971), this Court noted that a defendant's intent to deprive the mortgagee or secured party of its security normally must be inferred from what he does. In the present case, the evidence, when viewed in the light most favorable to the prosecution, shows that appellant offered the diamond as collateral on the investments with the understanding that if the notes were not repaid, the investors could sell the diamond. In support of this evidence, the State introduced one of the promissory notes to which the "assignment" of the diamond and a descriptive report from the Gemological Institute of America were attached. Other testimony established that appellant later mortgaged the diamond without the consent of his investors, giving at that time the same descriptive report with the last number changed. From this evidence, the jury could have found that appellant intentionally mortgaged the diamond to a third party without the permission of the investors to whom he had previously conveyed rights in the same diamond.

■ Appellant's next contention concerns the form of the instruments given to the investors. Signed by appellant and la-

beled an "ASSIGNMENT OF PROPERTY," they provided that appellant assigned the diamond, described in an attached report, "as security for that certain promissory note." Appellant now contends that the instruments were an "absolute and simple assignment" and, therefore, were not mortgages or instruments intended to operate as a mortgage within the meaning of § 6–7–603. The State contends that the instruments were security agreements which are expressly included within § 6–7–603 as instruments intended to operate as mortgages.

A security agreement is defined in § 34–21–905(a)(viii), W.S.1977 (now § 34–21–905(a)(xii), W.S.1977, 1985 Cum.Supp.) as "an agreement which creates or provides for a security interest." A security interest according to § 34–21–120(a)(xxxvii), W.S.1977, "means an interest in personal property * * * which secures payment or performance of an obligation."

Documents containing assignment language have been upheld as adequate security agreements even though not labeled as such. White & Summers, U.C.C.2d § 23–3 at 906–907 (1980). Here there is an agreement which, in addition to containing the assignment language, also stated that the "assignment" was "as security" for the promissory notes. One of the investors testified that the "assignment" was intended to allow the holders of the notes to sell the diamond and retain the proceeds if the notes were not paid. There is no question that the instruments contained a description of the collateral or that they were signed by appellant. They were security agreements as defined by § 34–21–905(a)(viii) and were intended to operate as mortgages within the meaning of § 6–7–603.

■ Appellant's final claim with respect to § 6–7–603 is that because the diamond was never in Wyoming, his conviction cannot be upheld. Appellant's claim is based on a misreading of the statute. Section 6–7–603 provided that a felony has been committed *either* when mortgaged or secured property is disposed of without the

mortgagee's or secured party's consent *or* when such property is removed from the jurisdiction where it was when the mortgage or security agreement was given. In the present case, appellant was convicted because he disposed of previously mortgaged property without consent, not because he moved the mortgaged property to a different jurisdiction.

### III

Appellant's final claim concerns his conviction for perjury under § 6–8–101. The charge arose from statements made by appellant at a debtor's examination held after appellant was unable to pay a judgment of approximately $75,000 to a construction company which had done work for him. At trial, the State attempted to show that appellant made a number of false statements in violation of § 6–8–101, which provided:

> "Whoever, being under oath or affirmation lawfully administered, shall willfully, corruptly and falsely testify or make any false affidavit, certificate, declaration, deposition or statement in any judicial, legislative, or administrative proceeding in which an oath or affirmation may be required by law, touching a matter material to the point in question, is guilty of perjury * * *."

In *Edwards v. State*, Wyo., 577 P.2d 1380, 1382 (1978), this Court held that:

> "A charge of perjury requires proof of three elements: (1) the materiality of the perjured evidence upon the issue in the trial in which it was given; (2) that the defendant testified as alleged; and (3) that his testimony (evidence) was knowingly and corruptly false. * * *"

Although there were four alleged instances of false responses, any one alone is sufficient to support a conviction under § 6–8–101. Therefore, we will only concern ourselves with one of the responses. The following testimony was given by appellant before the debtor's examination:

> "Q. Have you in your own name or jointly any bank accounts?

> "A. Yes, a bank account at American Bank in my name, and I have one at Wyoming National Bank in my name.

> "Q. In your name only?

> "A. Yes, uh-huh.

> "Q. Are there any—are those checking accounts?

> "A. Yes, sir.

> "Q. Are there any funds in those accounts?

> "A. No, sir.

> "Q. Do you have any savings accounts?

> "A. No, sir.

> "Q. Do you have any other bank accounts, with the exception of those two?

> "A. Corporate accounts.

> "Q. And where are those?

> "A. Basically the same banks."

At trial, the State showed that appellant had two additional bank accounts, one at Security Bank in Gillette and one at Citizens Bank in Salt Lake City in which a check for $1,500 to appellant was deposited shortly before the examination. Appellant has never contested the existence of these two accounts but instead claims that he was distinguishing between personal and business accounts and that these two were business accounts. According to appellant, his failure to identify the two accounts was not a false statement but was an answer to a vague question as well as an honest mistake.

The contention that the response was an "honest mistake" goes to the element of knowing that the statement was false. "It is for the jury to say whether one charged with perjury did construe, or could have construed, the question as meaning what he said he understood it to mean." 60 Am.Jur.2d, Perjury § 9 at 972 (1972). In this case, the jury could have properly concluded that appellant did not construe the question as asking for only personal accounts, for in the preceding answer appellant referred specifically to "[c]orporate accounts." In addition, appellant admitted at trial that one of the accounts was for both business and personal purposes.

Appellant next contends that the statement must be more than incomplete or misleading; it must be false. He cites *People v. French*, 134 Cal.App. 694, 26 P.2d 310 (1933), for the proposition that failure to make a statement, which if made would be material, is not perjury. We do not agree with the premise that appellant merely failed to make a statement. When asked if he had *any* bank accounts other than those which he had disclosed, appellant responded, "[c]orporate accounts." In light of his statement at trial that the Salt Lake City account was both personal and business, this response was false. The statement that his "[c]orporate" accounts were "[b]asically [at] the same banks" was also false because these two accounts were at banks other than those identified in previous answers.

For all of the reasons stated above, we affirm appellant's conviction on all counts.